**THE NIRENBERG LAW FIRM, LLC**
One University Plaza, Suite 607
Hackensack, NJ 07601
Tel: (201) 487-2700
Fax: (201) 487-2701
JNirenberg@njemploymentlawfirm.com
Attorneys for Plaintiff Regina Tasca

|  |  |
|---|---|
| **REGINA TASCA,**<br><br>Plaintiff<br><br>v.<br><br>BOROUGH OF BOGOTA, POLICE CHIEF JOHN C. BURKE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, POLICE CAPTAIN JAMES L. SEPP, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, POLICE SERGEANT ROBERT PITERSKI, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, AND PATROLMAN JEROME FOWLER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY,<br><br>Defendants. | **CIVIL ACTION NO.**<br><br><br><br>**COMPLAINT & JURY DEMAND** |

Plaintiff Regina Tasca, by way of Complaint against Defendants Borough of Bogota,

Police Chief John C. Burke, individually and in his official capacity, Police Captain James L.

Sepp, individually and in his official capacity, Police Sergeant Robert Piterski, individually and

in his official capacity, and Patrolman Jerome Fowler, individually and in his official capacity,

says:

## **JURISDICTION**

1.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and

1343(a)(3) and (4).

2.      The supplemental jurisdiction of this Court over state claims is invoked pursuant to 28 U.S.C. § 1367(a).

3.      Venue is proper within this District because the unlawful practices complained of herein occurred within the District of New Jersey.

4.      The causes of actions alleged herein seek to redress the deprivation, under the color of state law, policy and/or custom, of rights secured by the United States Constitution, 42 U.S.C. § 1983 ("§1983"), as well as the New Jersey Constitution, the New Jersey Civil Rights Act, N.J.S.A. § 10:6-1, *et seq*. ("NJCRA"), the Conscientious Employee Protection Act, N.J.S.A. § 34:19-1, *et seq*. ("CEPA"), and New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, *et seq*. ("LAD"), to recover damages, costs, attorney fees and equitable relief pursuant to §1983, 42 U.S.C. § 1988, the United States Constitution, the New Jersey Constitution, the NJCRA, CEPA, and the LAD.

## **PARTIES**

5.      Plaintiff Regina Tasca ("Officer Tasca") resides at 25 Beasley Terrace, Paramus, NJ 07652.  Officer Tasca has been employed as a Patrol Officer in the Bogota Police Department since January 24, 2001.

6.      Defendants Borough of Bogota ("Bogota") is a municipality in Bergen County, New Jersey.  Bogota's principal place of business is at 375 Larch Avenue, Bogota, NJ 07603.

7.      Defendant John C. Burke ("Burke"), an individual, is the Chief of Defendant Bogota's Police Department.  Burke resides at 46 Dewey Drive, Ringwood, NJ 07456.  Burke is being sued individually and in his official capacity.

8.      Defendant Burke is a final policymaker of the Bogota's Police Department.

9.     Defendant James L. Sepp ("Sepp"), an individual, is the Captain of Bogota's Police Department.  Sepp resides at 210 Oakwood Avenue, Bogota, NJ 07603.  Sepp is being sued individually and in his official capacity.

10.     Defendant Robert Piterski ("Piterski"), an individual, is a Sergeant in Bogota's Police Department.  Piterski resides at 188 Summit Avenue, Bogota, NJ 07603.  Piterski is being sued individually and in his official capacity.

11.     Defendant Jerome Fowler ("Fowler"), an individual, is a Patrolman in Bogota's Police Department.  Fowler resides at 240 E. Woodland Road, New Milford, NJ 07646.  Fowler is being sued individually and in his official capacity.

## FACTUAL BACKGROUND

### DEFENDANTS DENY OVERTIME PAY TO OFFICER TASCA

12.     In 2001, Lieutenant George Graf repeatedly made comments to Officer Tasca that he could not believe Bogota hired a female police officer.

13.     On or about March 12, 2002, Defendants denied Officer Tasca one hour of overtime pay when she worked past midnight on the evening when clocks were adjusted for daylight savings time.

14.     Bogota paid everyone else who worked that shift for one hour of overtime.

### SEPP HARASSES OFFICER TASCA

15.     On or about April 7, 2002, after Officer Tasca issued a parking ticket to one of Sepp's friends, John Lyons, Sepp hung a copy of the ticket in multiple locations in the Police Department on which he stated that the ticket was "bullshit."

16. On or about April 7, 2002, Sepp sent an email to all officers in the Police Department in which he admits he posted comments about Officer Tasca throughout police headquarters.

17. On or about April 8, 2002, Officer Tasca forwarded a copy of Sepp's email to Captain Michael Brophy and Chief Frank Gurnari, and alleged Sepp was harassing and slandering her.

18. On or about April 12, 2002, Officer Tasca attended a meeting with Gurnari and Brophy regarding Sepp's actions.

## DEFENDANTS BELITTLE OFFICER TASCA

19. On or about June 30, 2002, a citizen came to Police Headquarters to discuss a summons they received from Officer Tasca. Graf told the citizen that Officer Tasca is a new officer, and all she knows how to do is write tickets.

20. On or about July 17, 2002, Graf informed Officer Tasca that he told Bogota's Borough Administrator, Mike McMahon, that Officer Tasca is a problem because she writes too many tickets.

21. On July 7, 2002, Fowler informed Officer Tasca that Sergeant James Lemakos made disparaging comments about her to Fowler and two Teaneck Police Officers.

22. On or about July 24, 2002, Officer Tasca submitted a report to Brophy and her immediate supervisor, Burke, stating that Lemakos was harassing her because of her gender.

23. On or about September 27, 2002, Piterski informed a resident of Bogota, Allison Bookspan, that Officer Tasca is gay.

24. When Officer Tasca asked Piterski why he told Ms. Bookspan she is gay, Piterski yelled and screamed at Officer Tasca in front of Ms. Booksan and her husband.

**PITERSKI FAILS TO ASSIST TASCA WHEN A CITIZEN ASSAULTS HER**

25.     On or about February 6, 2003, Officer Tasca and Piterski responded to a 911 call.

26.     At the scene of the 911 call, two individuals, Ms. Herrera and her daughter, Ann Marie Kenyon, assaulted Officer Tasca.

27.     Piterski failed to assist Officer Tasca when Ms. Herrera and Ms. Kenyon assaulted her., in violation of a Department Standard Operating Procedure ("SOP"), policy, practice, and/or procedure.

28.     When Officer Tasca asked Piterski why he failed to assist her, his response was "Oh well."

**PITERSKI THREATENS TO COMMIT PERJURY TO HELP FALSELY CONVICT TASCA OF ASSUALTING THE CITIZEN WHO ASSAULTED HER**

29.     Ms. Herrera subsequently filed a criminal complaint against Officer Tasca, claiming Officer Tasca assaulted her.

30.     Prior to start of the trial, Piterski told Officer Tasca that she better hope he did not have to testify, and implied he would falsely testify that Officer Tasca assaulted Ms. Herrera.

31.     Trial testimony from Ms. Herrara's son, John Clark, confirmed that:

      a.     Ms. Herrera assaulted Officer Tasca;

      b.     Officer Tasca did not assault Ms. Herrera; and

      c.     Piterski failed to assist Officer Tasca after Ms. Herrara and Ms. Kenyon assaulted her.

32.     The case was dismissed before Piterski needed to testify at the trial.

33.     All charges against Officer Tasca were dismissed.

## PITERSKI HARASSES TASCA WHEN SHE SOUGHT FIREARMS CERTIFICATION

34.     In May 2003, Piterski was the Range Master for the Bogota Police Department at the New Milford Police shooting range.

35.     On or about May 10, 2003, Piterski told Officer Tasca she only needed to bring one box of ammunition to the shooting range to qualify with her off-duty gun.

36.     When Officer Tasca arrived at the shooting range with one box of ammunition, Piterski told her she did not have enough ammunition to qualify with her off-duty gun.

37.     Piterski surreptitiously video recorded Officer Tasca while she was at the shooting range.

38.     Piterski rarely, if ever, video recorded anyone else at the shooting range.

39.     Even though Officer Tasca's qualification score was 92/94, Piterski recorded her score as 82/84, and refused to correct her score when she told him he had recorded it incorrectly.

## PITERSKI HARASSES TASCA WHILE SHE WAS ON SICK LEAVE

40.     On or about May 30, 2004, Piterski called Officer Tasca at home while she was out sick, and issued an "urgent" order that she check if her duty weapon had been cleaned.

41.     Defendants did not order any other officers to check if their weapons had been cleaned at that time.

42.     When Officer Tasca reported to duty the next day, she did not feel well and was experiencing chest pains as a result of Piterski's harassment.

43.     On or about May 31, 2004, at the beginning of her shift, Officer Tasca informed Piterski that she did not feel well and was experiencing chest pains.

44.     Piterski responded to Officer Tasca by screaming words to the effect that "it's always on my shift."

45.     On information and belief, Officer Tasca then fainted.  The next thing Officer Tasca recalls, she woke up on the floor of Police Headquarters where a Paramedic was administering an IV in her arm.

46.     Officer Tasca was then transported to Holy Name Hospital, where she was treated for a stress-related incident.

47.     On or about May 30, 2004, Officer Tasca submitted a report to Chief Gurnari inquiring about the urgency of Piterski's order to check if her duty weapon had been cleaned, asking why she had been singled out, and alleging this was another form of harassment.

48.     On or about June 3, 2004, after Chief Gurnari informed Piterski that Officer Tasca had alleged he harassed her, Piterski sent an email to all officers informing them that a weapon inspection would take place on June 20, 2004.  However, that inspection never took place.

49.     On or about June 7, 2004, Piterski sought to discipline Officer Tasca for submitting an incomplete daily sheet for May 31, 2004.

50.     Officer Tasca's daily sheet for May 31, 2004 did not include any calls because she was taken to the hospital before she had an opportunity to make any calls.

51.     Likewise, Officer Tasca's daily sheet for May 31, 2004 did not include her end mileage because she was in the hospital, and could not check the mileage on her patrol car at the end of her shift.

52.     On or about June 7, 2004, Officer Tasca completed worker's compensation documentation regarding the events leading up to her hospitalization on May 31, 2004.  On the form, Officer Tasca indicated her heart palpitations were the result of Piterski's harassment.

53.     Brophy refused to submit Officer Tasca's workers' compensation forms to Bergen Risk Managers expressly because of the way Officer Tasca described the cause of the events that caused her to be hospitalized.

## DEFENDANTS AGAIN DENY OFFICER TASCA OVERTIME PAY

54.     On June 16, 2004, Sergeant Lemakos denied Officer Tasca overtime pay, even though she followed his instruction to begin working on the arrest of a female suspect prior to the beginning of her shift.

55.     Under the applicable Collective Bargaining Agreement between Bogota and the Union (the "CBA"), Bogota is required to pay a minimum of four hours of overtime anytime a Police Officer is called in prior to the beginning of his or her shift.

## OFFICER TASCA FORMALLY OBJECTS TO PITERSKI'S HARASSMENT

56.     On or about June 17, 2004, Officer Tasca advised Brophy in writing that she intended to pursue formal harassment charges against Piterski regarding his previous harassment of her.  In response, Brophy told Officer Tasca that the next step was to file a complaint with Bogota's Mayor and Council.

57.     On or about June 29, 2004, Officer Tasca submitted a complaint regarding Piterski's harassment to Bogota's Mayor and Council.

## PITERSKI THREATENS OFFICER TASCA AFTER SHE ISSUES A PARKING TICKET TO HIS RELATIVE

58.     On or about July 23, 2003, Officer Tasca issued a parking ticket to a vehicle belonging to one of Piterski's relatives.

59.     Shortly thereafter, Piterski hung several copies of the ticket in the police department on which he wrote "$19.00 for me a lot more for you!!!"

**PITERSKI HARASSES OFFICER TASCA BY NEEDLESSLY
REVIEWING AN ARREST SHE MADE**

60.     On or about August 4, 2004, Dispatcher John Lyons informed Officer Tasca that Piterski was reviewing the tape of an arrest she had made, even though Piterski had nothing to do with arrest, and was neither her Sergeant nor the Tour Commander on that call.

61.     Prior to August 4, 2004, Piterski had never reviewed the tape of another officer's arrest without a valid reason to do so.

62.     On or about August 9, 2004, Officer Tasca submitted a report to Brophy in which she indicates that Piterski harassed her by reviewing the tape of this arrest without a valid basis.

**PITERSKI CONTINUES TO HARASS OFFICER TASCA**

63.     On or about August 27, 2004, Piterski returned a DWI report Officer Tasca had submitted and instructed her to correct it without identifying what needed to be corrected.

64.     On or about August 9, 2004, Piterski ordered Officer Tasca to take a member of the Auxiliary Police Force on a ride-along.

65.     Bogota's SOPs prohibit officers from taking Auxiliary members on ride-alongs.

66.     On or about August 28, 2004, Officer Tasca submitted a report to Brophy regarding Piterski's illegal order to take an Auxiliary member on a ride-along.

**PITERSKI IMPROPERLY DENIES OFFICER TASCA OVERTIME PAY**

67.     Under Article XVII of the CBA, "[o]vertime for regularly scheduled shifts and details will be offered to regular full time Employees of the Department first, in an order of preference based upon a rotating seniority rose within rank."  The express "purpose of this Section is to equalize overtime among Employees and same shall not be defeated by Employers selection."

68.     On or about October 27, 2004, Piterski denied Officer Tasca an overtime shift by taking the shift himself, and claiming it was already filled.

69.     Officer Tasca filed a grievance and a written report to Brophy objecting to Piterski's refusal to grant her that overtime shift.

70.     After investigating, Brophy concluded that Piterski lied when he claimed he took the overtime himself because no one else wanted it.

71.     Brophy further concluded that Officer Tasca should have been granted the overtime shift.

**OFFICER TASCA REFUSES TO SIGN A FALSE OVERTIME CARD FOR PITERSKI**

72.     On or about May 2, 2005, Piterski submitted an overtime card to Officer Tasca which reflected overtime hours he had not worked, presumably hoping she would sign it without reviewing it.

73.     Officer Tasca refused to sign Piterski's false overtime, and instead forwarded a copy of it to Gurnari.

74.     On or about May 11, 2005, Officer Tasca submitted a written report to Brophy regarding the false overtime card Piterski submitted to her on or about May 2, 2005.

**DEFENDANTS REMOVE OFFICER TASCA'S
NAME FROM AN OVERTIME SIGNUP SHEET**

75.     On or about June 27, 2005, someone crossed Officer Tasca's name off of an overtime shift list on which she had signed up.

76.     After Officer Tasca wrote to Chief Gurnari regarding this incident, Gurnari reinstated Officer Tasca's request for overtime.

## DEFENDANTS REFUSE TO FIT OFFICER
## TASCA FOR BICYCLE PATROL EQUIPMENT

77.     From approximately June 2 through June 6, 2003, Officer Tasca attended the Bergen County Police Academy for Bicycle Patrol training.

78.     Defendants provided bicycle patrol uniforms and equipment to the other two Bogota Police officers who attended the Bergen County Police Academy for Bicycle Patrol training.

79.     Even though Officer Tasca repeatedly asked Gurnari and Burke to have her fitted for bicycle patrol uniforms and equipment, and Bogota Savings Bank offered to pay the full cost of her bicycle uniforms and equipment, Defendants never fitted Officer Tasca for bicycle patrol uniforms or equipment.

## OFFICER TASCA REFUSES TO SIGN A SECOND
## FALSE OVERTIME CARD FOR PITERSKI

80.     On or about August 2, 2005, Piterski submitted an overtime card seeking 4 hours of overtime based on the fact that he had worked past the end of his shift.

81.     Under the CBA, members of the Police Department are entitled to only one-and-a-half hours of overtime when they work past the end of their shifts.

82.     Officer Tasca refused to sign Piterski's overtime card because he improperly sought four hours of overtime pay.  Instead, she forwarded a copy of it to Brophy.

83.     Brophy subsequently concluded that Piterski was only entitled to receive 1 ½ hours of overtime pay.

## VANDALISM OF OFFICER TASCA'S LOCKER

84.     On or about March 31, 2006, someone forced open Officer Tasca's locker room, damaging the door jam and breaking the lock.

85.     Officer Tasca reported the vandalism of her locker room to Brophy.

86.     On or about April 1, 2006, someone left several trash cans filled with trash into Officer Tasca's locker room.

87.     On or about April 1, 2006, Officer Tasca reported the second vandalism of her locker room to Burke.

88.     Burked told Officer Tasca he saw the person who placed the trash cans into her locker room, and indicated that he instructed that individual to remove them.

89.     Nonetheless, since the person who placed the trash cans into Officer Tasca's locker never removed them, Officer Tasca eventually had to remove them herself.

90.     On or about April 1, 2006, Officer Tasca wrote to Gurnari and Brophy regarding the two instances of vandalism of her locker room, and asked them to repair her locker room and replace the lock.

91.     Although Defendants provided Officer Tasca a new lock for her locker room, Gurnari and Brophy kept copies of the key, and left the door open on multiple occasions.

**OFFICER TASCA REFUSES TO SIGN A THIRD
FALSE OVERTIME CARD FOR PITERSKI**

92.     On or about April 10, 2006, Piterski was offered and declined a private sector overtime detail at Verizon.

93.     Nonetheless, Piterski submitted an overtime card and a report to Brophy on which he falsely claimed he had not been offered the opportunity to work that overtime detail.

94.     On or about April 10, 2006, Officer Tasca submitted a report to Brophy explaining that Piterski had been offered and declined that overtime detail.

**SEPP AND BURKE GO OUT OF THEIR WAY TO TESTIFY AGAINST
OFFICER TASCA REGARDING A PARKING TICKET SHE ISSUED**

95.     On or about February 3, 2006, Officer Tasca learned that a resident of Bogota, John Lyons, had filed a complaint against her stemming from a parking ticket she issued to him.

96.     The parking ticket Officer Tasca had issued to Mr. Lyons was valid.

97.     Mr. Lyons is friends with many members of the Bogota Police Department, including Sepp and Burke.

98.     On or about April 18, 2006, Sepp and Burke appeared in municipal court to testify against Officer Tasca regarding the parking summons she had issued to Lyons.

99.     Neither Sepp nor Burke was present when Officer Tasca issued the parking ticket to Mr. Lyons.  Their only relevant knowledge was based on hearsay and/or photographs they took in an effort to support Lyons.

100.    It is highly unusual for a Bogota Police Officer to testify against another Bogota Police Officer regarding a parking ticket, especially when the officers were not present when ticket was issued.  On information and belief, this was the first and only time this has ever happened in Bogota.

101.    Mr. Lyons eventually dropped the complaint he filed against Officer Tasca.

**DEFENDANTS CONTINUE TO HARASS OFFICER TASCA**

102.    On or about February 24, 2007, someone removed Officer Tasca's name from her mail slot.

103.    Officer Tasca's name was subsequently removed from her mail slot on numerous occasions, including but not necessarily limited to on or about January 25, 2008, January 19, 2010, July 8, 2009, and twice on or about November 24, 2008.

**DEFENDANTS REPEATEDLY FAIL TO PROVIDE BACKUP TO OFFICER TASCA**

104.    On or about January 3, 2009, Defendant's Dispatcher sent Officer Tasca on a call to assist a woman who indicated she was being followed on West Fort Lee Road.

105.    Officer Tasca made four radio calls seeking backup on that call.

106.     Since Defendants ignored Officer Tasca's calls for backup, she had to handle that call by herself.

107.     On or about January 9, 2009, Defendants failed to provide backup to Officer Tasca on a motor vehicle stop.

**DEFENANTS CONTINUE TO DENY OVERTIME PAY TO OFFICER TASCA**

108.     On or about January 3, 2009, Officer Tasca worked more than 30 minutes past the end of her shift at the scene of an accident.

109.     On the following day, Sepp told Officer Tasca not to submit her overtime card from her previous shift, claiming she had not worked 30 minutes of overtime.

110.     Even though Officer Tasca agreed to change her overtime card to list 22 minutes of overtime, Sepp grabbed Officer Tasca's overtime card out of her hand, and left.

**OFFICER TASCA'S CAR IS VANDALIZED AT POLICE HEADQUARTERS**

111.     On or about January 17, 2009, Officer Tasca's personal vehicle was keyed from the front quarter panel to the rear quarter panel while it was parked in the Police Headquarters parking lot during her she shift.

112.     When Officer Tasca discovered this vandalism to her car, she reported it to Sepp.

113.     On or about January 21, 2009, while she was off duty, Officer Tasca reported the vandalism of her car to Burke, and filled out an affidavit regarding the vandalism.

114.     Burke directed the Detective Bureau to investigate the vandalism to Officer Tasca's car.

115.     Despite Officer Tasca's repeated discussions with Burke, it took Defendants more than six months to investigate the vandalism to Officer Tasca's vehicle.

**SEPP PROHIBITS OFFICER TASCA FROM LEAVING AT THE END OF HER SHIFT**

116.    At all times relevant, it has been practice and/or procedure in the Bogota Police Department that officers are relieved from duty once the oncoming shift has arrived and is ready to begin its shift.

117.    On or about January 26, 2009, Sepp ordered Officer Tasca, through the chain-of-command, that she could not gear down until the oncoming Sergeant relieved her.

118.    Defendants did not issue a similar order or requirement for anyone else.

**DEFENDANTS FAIL TO REPLACE OFFICER<br>TASCA'S DEFECTIVE BULLET PROOF VEST**

119.    In or around April 2009, Officer Tasca sent an email to Burke and Gurnari stating that her bullet proof vest had been recalled by the manufacturer and needed to be replaced.

120.    Officer Tasca periodically followed up with Burke about her replacement bullet proof vest from April 2007 until at least January 2010.

121.    Defendant failed to provide Officer Tasca a new bullet proof vest until on or about March 3, 2010, thereby putting her life in increased jeopardy for approximately two years.

**DEFENDANTS DENY OFFICER TASCA OVERTIME PAY YET AGAIN**

122.    On August 19, 2009, Officer Tasca submitted an overtime card for 2 hours and 45 minutes she spent attending CPR training.

123.    Defendants subsequently reduced the time on Officer Tasca's overtime card to 1 hour and 45 minutes, thereby depriving her of one hour of overtime pay.

**DEFENDANTS DENY OFFICER TASCA DOMESTIC VIOLENCE TRAINING**

124.    On October 27, 2009, Defendants provided domestic violence training to all other members of the Police Department, but failed to provide the training to Officer Tasca.

## DEFENDANTS VANDALIZE OFFICER TASCA'S LOCKER AGAIN

125.    On or about January 19, 2010, someone vandalized Officer Tasca's locker by breaking the lock by jamming something into it, covering the handle of the locker with fingerprint ink, and placing a note on the locker which said "I hope you enjoyed your day off watching the game.  Love Brett," implying she was watching a football game when she was actually home sick.

126.    Officer Tasca promptly reported the vandalism of her locker to Burke, who was the Internal Affairs officer.  Burke told Officer Tasca he would investigate the vandalism.

127.    Burke and Officer Tasca then used tools to remove the hinges from Officer Tasca's locker so they could retrieve her duty gear.

128.    Officer Tasca and Burke were both covered with fingerprint ink and received lacerations to their hands attempting to pry open her locker.

## OFFICER TASCA BEGINS EXPERIENCING SEVERE EMOTIONAL DISTRESS AS A RESULT OF DEFENDANTS' HARASSMENT

129.    When Officer Tasca began her detail on January 19, 2010, she was extremely upset about the vandalism of her locker.  While she was working that day, her heart was racing and she felt nauseous.

130.    Officer Tasca radioed Burke to her location, and told him that heart was racing and she felt nauseous.

131.    In response, Burke offered to meet Officer Tasca at her location.

132.    When Burke arrived at Officer Tasca's location, she requested permission to go home sick because of how she was feeling as a result of the harassment.

133.    Burke agreed, and acknowledged that the Bogota Police Department was an extremely hostile work environment for Officer Tasca.

134.     Burke also informed Officer Tasca that someone had once again removed her name from her mail slot that morning, but he had already replaced it.

135.     Officer Tasca left her detail and returned to headquarters to remove her gear, and then went home sick.

136.     As a result of going home sick before the end of her shift, Officer Tasca lost two hours of paid overtime.

137.     As Officer Tasca was preparing to drive home, Burke said he was going to put on her sick card that she had an upset stomach.  When Officer Tasca repeated that she was nauseous and her heart was racing, Burke repeated that he was going to indicate she had an upset stomach.

138.     Sergeant Timothy Giepel subsequently admitted to Burke that he wrote the note on Officer Tasca's locker.

139.     Defendants only issued a verbal reprimand to Giepel for putting the note on Officer Tasca's locker.

140.     At the beginning of her shift on or about January 20, 2010, Officer Tasca discovered that the previous occupant of her patrol car had not signed out of the Info-Cop computer system, in violation of the Department SOPs.

141.     On the Info-Cop system, Officer Tasca discovered a conversation in which Fowler and other members of the Police Department discussed the fact that they were the ones who had vandalized Officer Tasca's locker.

142.     Officer Tasca promptly called Burke and Sergeant Lynch, and notified them about the comments on Info-Cop.

143.     Officer Tasca subsequently showed the comments on Info-Cop to Lynch, Burke and Gurnari.

144.     Officer Tasca took a picture of the conversation on Info-Cop with the camera on her cell phone.

145.     Several days later, Defendants issued a memo prohibiting members of the Police Department from carrying cell phones.

## OFFICER TASCA FILES A REPORT REGARDING THE ONGOING HARASSMENT

146.     On or about January 20, 2010, Officer Tasca submitted a complaint to Burke describing the harassment she has been experiencing since 2001.  Her report states that she was being harassed "because I am a female" and "because of my sexual orientation," and indicates that she fears additional harassment from her fellow officers in retaliation for filing her report.

147.     In her report, Officer Tasca indicates she has been taking sleeping pills because she has difficulty falling asleep due to the stress caused by the hostile work environment.

148.     Defendants never investigated the harassment described in Officer Tasca's report, other than to interview Officer Tasca herself.

149.     Defendants did not take any disciplinary actions against anyone for harassing Officer Tasca, did not take any remedial actions in response to her report, and did not take any steps to prevent anyone from retaliating against her.

## OFFICER TASCA IS THREATENED WITH RETALIATION

150.     Burke reported the vandalism of Officer Tasca's vehicle to the Bergen County Prosecutor's office.

151.     At a Department meeting on or about January 21, 2010, Fowler asked Burke why he thought it was necessary to call the Prosecutor's Office for an investigation.

152.     After Officer Tasca asked whoever vandalized her locker to admit it, a Sergeant twice shouted "you've been warned!"

153.    After the meeting, Officer Tasca told Burke she was concerned she would suffer retaliation for reporting the vandalism to her locker.

**OFFICER TASCA WINS A UNION GRIEVANCE REGARDING OVERTIME PAY**

154.    On or about January 24, Officer Tasca filed a union grievance regarding the two hours of overtime pay she was denied when she went home sick on January 19, 2010.

155.    In connection with Officer Tasca's grievance, Gurnari concluded that Officer Tasca had experienced a job-related sickness.  Accordingly, Officer Tasca eventually was paid for the full four hours of overtime to which she was entitled from January 19, 2010.

**BURKE SENDS OFFICER TASCA TO A FITNESS-FOR-DUTY EXAM**

156.    Officer Tasca worked her regular shifts on January 20 and 21, 2010, without incident.

157.    At the beginning of Officer Tasca's January 25, 2010 shift, Burke ordered her not to leave his office until she finished filling out a worker's compensation form.

158.    When Officer Tasca asked Burke why she had to fill out the form even though no one else who goes home sick is required to do so, he said it was because she filed a grievance.

159.    When Officer Tasca submitted the completed worker's compensation forms, Burke asked her how she was feeling.  Officer Tasca replied that she felt fine, and subsequently clarified that she felt as good as possible under the circumstances.

160.    Burke then asked Officer Tasca if she was satisfied with the investigation regarding the vandalism of her locker.

161.    In response, Officer Tasca indicated she was extremely disappointed with the way Defendants were handling the investigation, and there was nobody in the Department who she could trust.

162.    Burke then told Officer Tasca he could not permit her to go on duty until she saw the Borough's doctor, Dr. Miglietta, because she supposedly was not fit for duty.

163.    When Officer Tasca asked why she could not return to duty, Burke indicated it was because she went home sick on January 19.

164.    When Officer Tasca asked why she was not permitted to report to duty even though she already had worked two shifts after January 19, Burke became loud and agitated, and said that because of her grievance he had to submit a new sick card indicating that she had experienced nausea and heart palpations on January 19.

165.    On or about January 25, 2010, Officer Tasca spoke to Officer Jonathan Misskerg, in his capacity as union representative, about Burke's refusal to allow her to work.  Misskerg told Officer Tasca she needed to see Dr. Miglietta because she had a "mental problem," and Dr. Miglietta probably would send her to a psychiatrist, Dr. Guller, for a psychiatric evaluation.

166.    During that conversation, Misskerg (1) told Officer Tasca that everyone was "pissed" at her for calling in sick, (2) told her the vandalism of her locker was a direct result of her calling out sick, (3) shouted that she was not sick, and (4) told her she probably was not going to be paid for the two hours of overtime stemming from her grievance.

167.    After her conversation with Misskerg, Officer Tasca told Gurnari that Misskerg told her she was being sent for a fitness-for-duty exam because she had a "mental problem."

168.    Burke replied that it was possible she would be sent to a psychiatrist for a fitness-for-duty exam.

169.    Chief Gurnari then called Officer Tasca into his office and assured her that she was not being sent for a fitness-for-duty exam due to a "mental problem," and that if he thought she had a mental problem he would not have permitted to keep her gun.

20

170.     On or about January 25, 2010, Burke drove Officer Tasca to Dr. Miglietta for her examination.

171.     At the conclusion of the exam, Dr. Miglietta informed Officer Tasca that although everything looked fine, it would take approximately 24 hours to get the results of her blood work back, and he did not want her to return to work until he reviewed them.  As a result, Officer Tasca was not permitted to work for approximately one week, and lost the opportunity to earn overtime pay.

172.     On or about January 27, 2010, Dr. Miglietta called Officer Tasca and told her there was a problem with the machine that collected her urine sample, and asked her to return to his office to give another urine sample.

173.     When Officer Tasca informed Chief Gurnari about her conversation with Dr. Miglietta, Gurnari indicated he was surprised Dr. Miglietta had taken a urine specimen from her, asked her "who ordered that?," and indicated he merely wanted to make sure her heart was okay.

**DEFENDANTS BYPASS OFFICER TASCA FOR THE DETECTIVE BUREAU**

174.     In 2010, there was a vacancy in the Bogota Police Department's Detective Bureau.

175.     Prior to 2010, when there has been a vacancy in the Bogota Police Department's Detective Bureau, Defendants have offered the position to the most senior Patrol Officer.  If that individual has declined the position, Defendants have offered the position to the next most senior Patrol Officer.

176.     Prior to 2010, when the Bogota Police Department has had an opening for Sergeant, it has offered the position to the current Detective.

177.     In January 2010, Officer Tasca had the most seniority of Defendants' Patrolmen.

21

178.     In January 2010, Bogota had a vacancy in its Detective Bureau.

179.     In January 2010, instead of promoting Officer Tasca to the Detective Bureau, Defendants reassigned Lemakos to the Detective Bureau.

180.     January 2010 was the first time Defendants assigned a Sergeant to the Detective Bureau.

## DEFNDANTS' HARASSMENT CAUSES OFFICER TASCA TO EXPERIENCE DEPRESSION

181.     By February 2010, as a result of the hostile work environment, Officer Tasca was extremely depressed, experiencing difficulty sleeping, had a reduced appetite, had a reduced libido, at times did not want to leave her house, and at times was tearful.

182.     On February 10, 2010, while on patrol, Officer Tasca felt dizzy and light headed, and broke into a sweat.  Several other members of the Police Department told Officer Tasca she looked pale and gray.

183.     Members of the Bogota Police Department eventually called for an ambulance, and Officer Tasca was rushed to Holy Name Hospital.

184.     Officer Tasca remained hospitalized for approximately two-and-a-half days, with instructions from her doctor to take a week off from work.

185.     On February 10, 2010, while Officer Tasca was still at Holy Name Hospital, Burke came to the hospital and told Officer Tasca that he had concluded his Internal Affairs investigation regarding the vandalism of her locker.  Specifically, Burke informed Officer Tasca that he concluded:

  a.  Sergeant Geipel had written the note on her locker;

  b.  Geipel would receive only an oral reprimand for leaving the note on her locker; and

    c.   Fowler would receive only an oral reprimand for the comments he made on the Info-Cop system.

186.    On February 17, 2010, Officer Tasca was prescribed medication for the anxiety and depression she was experiencing as a result of Defendants' ongoing harassment.

187.    Officer Tasca's doctors cleared her to return to work on February 22, 2010.

188.    On February 22, 2010, Burke called Officer Tasca at home, and told her she needed to see Dr. Miglietta before she could return to work.

189.    Dr. Miglietta prescribed Officer Tasca a beta-blocker, and wrote a note indicating he was unable to clear her to return to work due to this new medication, but she could return to full duty in approximately one week.

## BURKE THREATENS TO SEND OFFICER TASCA FOR A PSYCHIATRIC EXAM

190.    On March 12, 2010, Burke showed Officer Tasca a copy of his final report regarding his investigation into the vandalism of her locker. The report does not mention anything about either the comments on the Info-Cop system or the threat.

191.    When Officer Tasca asked Burke why his report did not even mention the threat, Burke indicated that the person who made the threat said it was a "female conversation." Burke did not explain what this meant.

192.    In response, Officer Tasca asked to meet with Chief Gurnari regarding the threat.

193.    On March 12, 2010, after Officer Tasca had told Burke she wanted to meet with Chief Gurnari, Burke told Officer Tasca he "suddenly" understood how she took the statement "you've been warned!" as a threat.

194.    Burke further indicated that since Officer Tasca considered the statement a threat, he was going to talk to Chief Gurnari about sending her to Dr. Guller for a fitness for duty exam.

**DEFENDANTS CONTINUE TO HARASS OFFICER TASCA**

195.    On and around June 4, 2010, garbage pails were repeatedly placed in front of Officer Tasca's locker room door.

196.    On June 4, 2010, Officer Tasca sent another email to Burke, objecting to the fact that someone was still putting garbage pails in front of her locker room.

197.    On or about July 21, 2010, Defendants provided search warrant training to everyone in the department except Officer Tasca.

**OFFICER TASCA OBJECTS TO FOWLER REQUIRING ANOTHER OFFICER TO WORK 22 CONSECUTIVE HOURS BECAUSE SHE REASONABLY BELIEVES IT PUT LIVES IN JEOPARDY**

198.    On or about November 18, 2010, Officer Tasca objected when Fowler, who was the Tour Commander at the time, informed her that he was going to have Officer Daniel Creange work a second consecutive shift, for a total of 22 straight hours.

199.    In addition to this being inconsistent with prior practice, Officer Tasca reasonably believed that requiring Creange to work 22 consecutive hours was a threat to public health safety, and a threat to Creange's health and safety.

200.    When Officer Tasca told Fowler it was not safe to require Creange to work two consecutive shifts, Fowler replied "I don't give a shit."

201.    Still concerned about the danger of Fowler requiring Creange to work two consecutive shifts, Officer Tasca sent a text message to Burke about this since her immediate supervisor was on vacation.

202.    It was common for Officer Tasca and Burke to send text messages to each other regarding work-related matters.

203.    Sepp was upset that Officer Tasca sent this text message to Burke.

204.     On or about November 30, 2010, during a conversation with the parents of an individual whose car's tire had fallen off its rim, and in the presence of Officer Tasca, Lynch stated that Bogota will never hire another woman.  At the time, the niece of the individual with whom Lynch was speaking was seeking a position as a member of the Bogota Police Department.

## OFFICER TASCA OBJECTS TO SMOKING IN PATROL CARS, IN VIOLATION OF NEW JERSEY LAW

205.     New Jersey Law prohibits smoking in most public places and workplaces, including police patrol cars.  N.J.S.A. § 26:3D-58, *et seq.*

206.     In or about May 2008, Officer Tasca advised Chief Gurnari that she often smelled stale cigarette smoke in patrol cars and that the smoke caused her headaches.  Officer Tasca also asked whether there was a policy prohibiting smoking in patrol cars.

207.     On or about September 29, 2008, Officer Tasca sent an email to Chief Gurnari indicating that she frequently smelled smoke in patrol cars, and that working in patrol cars that smell of smoke causes her to experience migraine headaches and sore throats.

208.     On or about October 17, 2008, Burke sent an email to all officers asking them to refrain from smoking in patrol vehicles.

209.     On or about January 8, 2009, Officer Tasca reported to Burke that she observed cigarette ashes in the patrol car that had been assigned to her.

210.     On or about January 26, 2009, at Burke's request, Officer Tasca emailed him a copy of a New Jersey statute that prohibits smoking in most public places and workplaces.

211.     On or shortly after March 5, 2009, Burke informed Officer Tasca that he forwarded the information regarding smoking in the patrol cars to Chief Gurnari.

212.     Gurnari subsequently issued a memo prohibiting officers from smoking in patrol vehicles.

213.     On or about September 29, 2009, Officer Tasca submitted a report to Burke in which she objected to the fact that someone had smoked in her patrol car on the previous shift.

## BURKE SENDS OFFICER TASCA TO A FITNESS-FOR-DUTY EXAM BECAUSE SHE TOOK A SICK DAY DUE TO A MIGRAINE HEADACHE

214.     During Officer Tasca's shift that started on or about December 2, 2010, the patrol car to which she was assigned smelled of smoke.

215.     After driving for approximately two hours in her patrol car, Officer Tasca began to develop a severe headache.

216.     Although Officer Tasca switched to another patrol car, the smell of smoke was embedded in her uniform and hair, and she continued to experience a severe headache. Nonetheless, she completed her shift.

217.     The next morning, Officer Tasca woke up with a migraine headache. Accordingly, she texted Lynch and informed him that she was not feeling well, and was not sure if she would be able to work her 7 pm shift.

218.     Since Officer Tasca's headache had not improved by 3 pm, she called out sick for her upcoming shift.  During the call, the Dispatcher informed Officer Tasca that Burke wanted to speak to her.

219.     During the ensuing conversation, Burke informed Officer Tasca that she might be required to see the Borough doctor.

220.     Under the CBA, the Police Department is not entitled to request a doctor's note from a sick member of the Department unless he or she is out sick for three consecutive days.

221.    A few hours after Officer Tasca called out sick, Sepp ordered her to report to work by 7 pm, without explaining why.

222.    When Officer Tasca arrived at Police Headquarters in accordance with Sepp's Order, Sepp informed her that he was going to take her to Holy Name Hospital to see Dr. Miglietta because she had called out sick due to an allergy that occurred at work.

223.    Sepp and Sergeant Geipel then escorted Officer Tasca to Holy Name Hospital, driving her in the back of a patrol car as if she were under arrest.

224.    Dr. Miglietta's medical examination lasted less than ten minutes.

225.    Defendants have never ordered anyone else to be seen by Dr. Miglietta after they called out sick for a single shift.

## DEFENDANTS SUSPEND OFFICER TASCA AND
## SEND HER FOR A PSYCHIATRIC EXAMINATION

226.    Officer Tasca worked her next two 12 hour shifts, on or about December 4 and December 5, 2010, without incident.

227.    When Officer Tasca reported for duty for her scheduled shift on or about December 8, 2010, Sepp and Misskerg called her into the interview room and advised her that their conversation was being recorded.

228.    At the beginning of the meeting, Sepp instructed Officer Tasca to turn over her service weapon.

229.    Sepp then informed Officer Tasca to report to Dr. Guller, a psychologist, for a fitness-for-duty examination.

230.    When Officer Tasca asked why she was being sent to for a psychiatric evaluation in response to calling out sick due to a smoke allergy, Sepp claimed it was based on something in Dr. Miglietta's report, but refused to explain or to show her a copy of Dr. Miglietta's report.

27

231.    On December 9, 2010, Officer Tasca reported to Dr. Guller for her scheduled examination.  The examination and testing lasted over six hours.

232.    On December 10, 2010, Sepp informed Officer Tasca that she was fit for duty, was not a danger to herself or others, was capable of carrying a weapon and fulfilling the full duties of her rank, and was cleared to return to work.

## DEFENDANTS MAKE IT IMPOSSIBLE FOR
## OFFICER TASCA TO SEEK A PROMOTION

233.    Defendants scheduled interviews for promotions on the evening of December 9, 2010, thereby making it impossible for Officer Tasca to seek a promotion to Sergeant.

## DEFENDANTS SPREAD RUMORS THAT OFFICER TASCA
## WAS TAKEN FOR A PSYCHIATRIC EVALUATION

234.    On December 12, 2010, Joseph Veryken, a resident of Bogota, asked Officer Tasca how she was doing.  When Officer Tasca asked Mr. Veryken why he asked, he stated that Fowler told him that Sepp ordered her to go for a psychological test.  Mr. Veryken then asked Officer Tasca if she was crazy.

235.    On or about December 14, 2010, Officer Tasca's attorney, Catherine Elston, Esq., sent a letter to Burke regarding Fowler discussing confidential information about Officer Tasca with a resident of Bogota.

236.    On or about January 10, 2011, Sepp interviewed Officer Tasca as part of an Internal Affairs investigation regarding, *inter alia*, Patrolman Geoffrey Cole smoking in a patrol car.  Sepp did not provide Officer Tasca any advance notice of this interview.

## DEFENDANTS FURTHER HARASS OFFICER TASCA ABOUT HER SICK LEAVE

237.    On or about February 7, 2011, Officer Tasca attended an Internal Affairs interview regarding her absence on December 3, 2010 due to her work-related illness.

238.     During the February 7, 2011 interview, Sepp claimed Officer Tasca was required to see a doctor on the day she experienced her work-related sickness based on Bergen Risk Managers' policy.  Bergen Risk Managers is the administrator of Bogota's workers' compensation benefits.

239.     Although Officer Tasca requested a copy of the policy to which Sepp was referring, it took him over a month to provide it to her.

240.     The policy Defendants finally provided to Officer Tasca did not include any requirement that a member of the Bogota Police Department who experiences a work-related sickness must see a doctor on the day he or she becomes sick.

241.     On or about January 15, 2011, Officer Tasca filed a union grievance regarding Defendants requiring her to go to a doctor on the day she experienced a work-related sickness.

242.     Officer Tasca's grievance was denied because Defendants failed to provide her a copy of the relevant policy until after the deadline for the grievance to be decided.

### DEFENDANTS DENY OFFICER TASCA OVERTIME PAY YET AGAIN

243.     On or about April 16, 2011, Officer Tasca worked 30 minutes of overtime, and submitted an overtime card.

244.     Sepp refused to allow Defendants to pay Officer Tasca for that overtime.

245.     Officer Tasca subsequently filed a grievance over this denial of overtime pay.

### DEFENDANTS DISCIPLINE OFFICER TASCA AFTER FOWLER WAS ASSAULTED BY A DRUNK WOMAN

246.     On or about April 3, 2011, Officer Tasca and Fowler escorted an ambulance that brought a woman who appeared to be heavily intoxicated to Holy Name Hospital pursuant to the New Jersey Alcohol Treatment Rehabilitation Act.

247.    Upon their arrival at the emergency room, Officer Tasca and Fowler were greeted by approximately 4 or 5 hospital security guards and several members of the medical staff.

248.    Shortly after their arrival at the hospital, the intoxicated woman attempted to leave the hospital.

249.    When Officer Fowler attempted to stop the woman from leaving the hospital, the woman assaulted him.

250.    One or more security guards assisted Fowler to subdue the intoxicated woman because they were closer to her than Officer Tasca.

251.    Officer Tasca acted appropriately, and did nothing that violated her obligations as a Police Officer during the altercation.

252.    Nonetheless, Defendants subsequently accused Officer Tasca of failing to assist Fowler during the altercation, and are attempting to use that as a justification to fire her.

## OFFICER TASCA ATTEMPTS TO STOP POLICE BRUTALITY

253.    On or about April 29, 2011, Officer Tasca was called to the home of an emotionally disturbed person, Kyle Sharp, to transport him to the hospital.

254.    Defendants called the Ridgefield Police Department as backup to this call.

255.    From the time Officer Tasca arrived at the scene, although Mr. Sharp was agitated and upset, he was neither armed nor took any aggressive or threatening actions toward anyone.

256.    Nonetheless, when Kyle Sharp stated he was going to "walk" and took a few steps, Ridgefield Park Sergeant Chris Thibault tackled him.

257.    After Sergeant Thibault tackled Mr. Sharp, Ridgefield Park Sergeant Detective Joseph Rella punched Mr. Sharp in the back of his head.

258.     When Officer Tasca saw Rella punch Mr. Sharp, she attempted to pull Rella off of Mr. Sharp to prevent him from assaulting Mr. Sharp further.

259.     Moments after Officer Tasca removed Sergeant Detective Rella from Mr. Sharp, during a heated exchange between Mr. Sharp's mother, the Ridgefield Park Police Officers, and Officer Tasca, Officer Tasca indicated that she would support Mr. Sharp's parents if they sought to file a lawsuit against the Ridgefield Park Police Department.

## DEFENADNTS SEND OFFICER TASCA FOR
## ANOTHER PSYCHIATRIC EXAMINATION

260.     On or about May 6, 2011, Sepp ordered Officer Tasca to surrender her duty weapon and police identification, and ordered her to attend another psychiatric evaluation.

261.     On or about May 9, 2011, Officer Tasca reported to Dr. Guller for her second psychiatric examination with him in less than six months.

262.     On or about May 18, 2011, Defendants suspended Officer Tasca, claiming she was not fit for duty.

## DEFENDANTS SUSPEND OFFICER TASCA

263.     On or about June 2, 2011, Bogota's Mayor and Council voted to suspend Officer Tasca indefinitely, with pay.

264.     Even though Officer Tasca is suspended with pay, she has lost, and continues to lose, substantial opportunities to earn overtime pay during her suspension.

## DEFENDANTS SEEK TO FIRE OFFICER TASCA

265.     On or about June 15, 2011, Defendants issued a Preliminary Notice of Disciplinary Action to Officer Tasca, seeking to have her removed from the Police Department.

266.     Defendants' disciplinary charges purportedly stem from Officer Tasca's alleged actions at Holy Name Hospital on April 3, 2011, and her interactions with Thibault and Rella on April 29, 2011.

267.     Officer Tasca's discipline is currently the subject of a departmental hearing before Retired Judge Richard J. Donohue, J.S.C.

## COUNT ONE

## (GENDER AND SEXUAL ORIENTATION DISCRIMINATION IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION)

268.     Officer Tasca repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

269.     Officer Tasca is the only female member in the history of the Bogota Police Department.

270.     Officer Tasca is the only openly gay member in the history of the Bogota Police Department.

271.     Defendants harassed, suspended, and otherwise discriminated against Officer Tasca because of her gender and/or because of her sexual orientation.

272.     Defendants' harassment of Officer Tasca is part of an ongoing pattern.

273.     Defendants' harassment of Officer Tasca is severe and/or pervasive such that it changed the terms and conditions of her employment.

274.     Defendants' actions constitute discrimination, suspension and harassment due to gender, in violation of the LAD.

275.     Defendants Burke, Sepp, Piterski, and Fowler each aided and abetted some or all of the other Defendants in their violations of the LAD.

276. As a result of Defendants' discriminatory actions, Officer Tasca has experienced, and will continue to experience, injuries including but not necessarily limited to economic losses, emotional distress, physical distress, and pain and suffering.

277. Defendants' discriminatory actions are egregious, willful, wanton, and in reckless disregard of Officer Tasca's rights.

278. Defendant Bogota's upper management, including but not limited to Defendants Burke, Sepp and Piterski, participated in the relevant unlawful conduct.

## COUNT TWO

### (GENDER DISCRIMINATION IN VIOLATION OF THE UNITED STATES CONSTITUTION)

279. Officer Tasca repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

280. Defendants harassed, suspended, and otherwise discriminated against Officer Tasca because of her gender.

281. Defendants' harassment of Officer Tasca is part of an ongoing pattern.

282. Defendants' harassment of Officer Tasca is severe and/or pervasive such that it changed the terms and conditions of her employment with Defendant Bogota.

283. Defendants failed to take steps to adequately prevent, remediate, or investigate the harassment and discrimination to which they subjected Officer Tasca.

284. Defendants Bogota, Burke, Sepp, Piterski and Fowler, as well as Defendant Bogota's Mayor and Council, failed to adequately supervise, train and discipline the individuals who harassed and discriminated against Officer Tasca.

285.     Defendants Burke, Sepp, Piterski and Fowler committed their unconstitutional discriminatory actions in their capacities as officials, agents and/or employees of Defendant Bogota pursuant to governmental policy, practice and/or custom, and under color of state law.

286.     Defendants' retaliatory actions violate the Fourteenth Amendment to the United States Constitution and §1983.

287.     Defendants' actions constitute discrimination, suspension and harassment due to gender, in violation of the United States Constitution.

288.     As a result of Defendants' discriminatory and retaliatory actions, Officer Tasca has experienced, and will continue to experience, injuries including but not necessarily limited to economic losses, emotional distress, physical distress, and pain and suffering.

289.     Defendants' discriminatory and retaliatory actions are egregious, willful, wanton, and in reckless disregard of Officer Tasca's rights.

290.     Defendant Bogota's upper management, including but not necessarily limited to Defendants Burke, Sepp and Piterski participated in the relevant unlawful conduct.

## COUNT THREE

### (RETALIATION IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION)

291.     Officer Tasca repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

292.     During her employment, Officer Tasca repeatedly objected to Defendants discriminating against her and harassing her because of her gender and sexual orientation.

293.     Defendants' further harassed Officer Tasca, suspended her, and otherwise discriminated against her in retaliation for her objections to their discrimination and harassment due to her gender and sexual orientation.

294. Defendants' harassment of Officer Tasca is part of an ongoing pattern.

295. Defendants' retaliatory harassment of Officer Tasca is severe and/or pervasive such that it changed the terms and conditions of her employment.

296. Defendants' actions constitute retaliation in violation of the LAD.

297. Defendants' retaliatory conduct constitutes harassment, suspension, and retaliation in violation of the LAD.

298. Defendants Burke, Sepp, Piterski, and Fowler each aided and abetted some or all of the other Defendants in their violations of the LAD.

299. As a result of Defendants' retaliatory actions, Officer Tasca has experienced, and will continue to experience, injuries including but not necessarily limited to economic losses, emotional distress, physical distress, and pain and suffering.

300. Defendants' retaliatory actions are egregious, willful, wanton, and in reckless disregard of Officer Tasca's rights.

301. Defendant Bogota's upper management, including but not limited to Defendants Burke, Sepp and Piterski, participated in the relevant unlawful conduct.

## COUNT FOUR

## (RETALIATION IN VIOLATION OF THE NEW JERSEY CIVIL RIGHTS ACT)

302. Officer Tasca repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

303. Officer Tasca's conduct, including but not necessarily limited to actions described above, is protected by the New Jersey Constitution and/or the United States Constitution.

304.    Defendants harassed, suspended, and otherwise retaliated against Officer Tasca in retaliation for her conduct that is protected by the New Jersey Constitution and/or the United States Constitution.

305.    Defendants' retaliatory actions deprived Officer Tasca of her rights under the New Jersey Constitution and/or the United States Constitution.

306.    Defendants' retaliatory actions are intended to punish Officer Tasca for exercising her rights under the New Jersey Constitution and/or the United States Constitution.

307.    Defendants' harassment of Officer Tasca is part of an ongoing pattern.

308.    Defendants' retaliatory harassment is severe and/or pervasive such that it changed the terms and conditions of Officer Tasca's employment.

309.    Defendants' conduct constitutes harassment, suspension, and retaliation in violation of the NJCRA.

310.    As a result of Defendants' retaliatory actions, Officer Tasca has experienced, and will continue to experience injuries including but not necessarily limited to economic losses, emotional distress, physical distress, and pain and suffering.

311.    Defendants' retaliatory actions were egregious, willful, wanton, and in reckless disregard of Officer Tasca's rights.

312.    Defendant Bogota's upper management, including but not limited to Defendants Burke, Sepp and Piterski, participated in the relevant unlawful conduct.

## COUNT FIVE

### (RETALIATION IN VIOLATION OF THE NEW JERSEY CONSTITUTION - COMMON LAW)

313.    Officer Tasca repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

314. Officer Tasca engaged in numerous acts, including but not necessarily limited to activities described above, which are protected by the New Jersey Constitution, including but not necessarily limited to Article I, Section 6 thereof.

315. Defendants harassed, suspended, and otherwise retaliated against Officer Tasca in retaliation for her acts protected by the New Jersey Constitution.

316. Defendants' retaliatory actions are intended to punish Officer Tasca for exercising her rights under the New Jersey Constitution.

317. Defendants' harassment of Officer Tasca is part of an ongoing pattern.

318. Defendants' retaliatory harassment is severe and/or pervasive such that it changed the terms and conditions of Officer Tasca's employment.

319. Defendants' retaliatory harassment, suspension, and other retaliatory actions against Officer Tasca violate the New Jersey Constitution under New Jersey's common law.

320. As a result of Defendants' retaliatory actions, Officer Tasca has experienced, and will continue to experience, injuries including but not necessarily limited to economic losses, emotional distress, physical distress, and pain and suffering.

321. Defendants' retaliatory actions were egregious, willful, wanton, and in reckless disregard of Officer Tasca's rights.

322. Defendant Bogota's upper management, including but not limited to Defendants Burke, Sepp and Piterski, participated in the relevant unlawful conduct.

## COUNT SIX

### (RETALIATION IN VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION)

323. Officer Tasca repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

324. Officer Tasca engaged in numerous actions that are protected by the First Amendment to the United States Constitution, including but not necessarily limited to activities described above.

325. Officer Tasca engaged in activities protected by the First Amendment in her capacity as a citizen, rather than as part of her duties as a Police Officer.

326. Defendants harassed, suspended, and otherwise retaliated against Officer Tasca in retaliation for her First Amendment protected activities.

327. Defendants' retaliatory actions are intended to punish Officer Tasca for exercising her rights under the First Amendment.

328. Defendants' harassment of Officer Tasca is part of an ongoing pattern.

329. Defendants' retaliatory actions are severe and/or pervasive such that Defendants changed the terms and conditions of her employment.

330. Defendants Bogota, Burke, Sepp, Piterski and Fowler, as well as Defendant Bogota's Mayor and Council, failed to adequately supervise, train and discipline the individuals who harassed, discriminated against, and retaliated against Officer Tasca.

331. Defendants Burke, Sepp, Piterski and Fowler committed their unconstitutional retaliatory actions in their capacities as officials, agents and/or employees of Defendant Bogota pursuant to governmental policy, practice and/or custom, and under color of state law.

332. Defendants' retaliatory actions violate the First Amendment to the United States Constitution and §1983.

333. As a result of Defendants' retaliatory actions, Officer Tasca has experienced, and will continue to experience, injuries including but not necessarily limited to economic losses, emotional distress, physical distress, and pain and suffering.

334.    Defendants' retaliatory actions were egregious, willful, wanton, and in reckless disregard of Officer Tasca's rights.

335.    Defendant Bogota's upper management, including but not limited to Defendants Burke, Sepp and Piterski, participated in the relevant unlawful conduct.

## COUNT SEVEN

### (RETALIATION IN VIOLATION OF THE CONSCIENTIOUS EMPLOYEE PROTECTION ACT)

336.    Officer Tasca repeats and re-alleges each and every allegation set forth above, as if set forth at length herein.

337.    Officer Tasca objected to numerous policies and practices of Defendants that she reasonably believed were unlawful, criminal, fraudulent, violated a clear mandate of public policy relating to public health, safety, welfare or protection of environment, and/or were otherwise protected under CEPA (hereinafter "CEPA-protected activity").

338.    Defendants harassed, suspended, and otherwise retaliated against Officer Tasca in retaliation for her CEPA-protected activities.

339.    Defendants' retaliatory actions were severe and/or pervasive such that they changed the terms and conditions of Officer Tasca's employment with Defendants.

340.    Defendants' conduct constitutes retaliation in violation of CEPA.

341.    As a result of Defendants' retaliatory conduct, Officer Tasca has experienced, and will continue to experience, injuries including but not necessarily limited to economic losses, emotional distress, physical distress, and pain and suffering.

342.    Defendants' retaliatory actions were egregious, willful, wanton, and in reckless disregard of Officer Tasca's rights.

343.    Defendant Bogota's upper management, including but not limited to Defendants Burke, Sepp and Piterski, participated in the relevant unlawful conduct.

## COUNT EIGHT

### (PERCEIVED DISABILITY DISCRIMINATION IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION)

344.    In or around December 2010, when Defendants sent Officer Tasca for a psychiatric evaluation, Defendants incorrectly perceived her to have a psychiatric condition without a sufficient basis in fact.

345.    As Dr. Guller confirmed, Officer Tasca did not have a psychiatric condition in December 2010.

346.    Defendants' harassed and discriminated against Officer Tasca based on their perception that she had a psychiatric disability, by actions including but not limited to:

    a.    Telling one or more members of the public that she had been taken for a psychiatric evaluation;

    b.    Prohibiting her from working on or about December 8 and 9, 2010;

    c.    Requiring her to undergo a lengthy psychiatric examination on or about December 9, 2010; and

    d.    Using information from Dr. Guller's December 2010 report as a justification to (i) suspend her on or about May 6, 2011; (ii) send her for a psychiatric evaluation on or about May 9, 2011; and (iii) issue disciplinary charges to her on or about June 15, 2011, seeking to fire her.

347.    Defendants' actions constitute disability discrimination in violation of the LAD.

348.    Defendants' harassment and discrimination of Officer Tasca is severe and/or pervasive.

349.     Defendants' harassment of Officer Tasca was part of an ongoing pattern.

350.     Defendants Burke, Sepp, and Fowler each aided and abetted some or all of the other Defendants in their violations of the LAD.

351.     Defendants' discriminatory actions were egregious, willful, wanton, and in reckless disregard of Officer Tasca's rights.

352.     Defendant Bogota's upper management, including but not limited to Defendants Burke and Sepp, participated in the relevant unlawful conduct.

**WHEREFORE**, Plaintiff Regina Tasca demands judgment and prays for the following relief, jointly and severally, against each of the Defendants:

A.     Compelling Defendants to reinstate her to her former position, with full seniority and all associated benefits;

B.     Enjoining and restraining each of the Defendants from future violations of state and federal law;

C.     Compensating Officer Tasca for her compensatory damages;

D.     Compensating Officer Tasca for her emotional and physical distress damages;

E.     Awarding punitive damages against each of the Defendants;

F.     Awarding a civil penalty against each of the Defendants pursuant to N.J.S.A. § 10:6-2(e);

G.     Awarding Officer Tasca her reasonable attorney's fees, costs, and disbursements; and

H.     Awarding such other and further relief which this Court deems just and proper.

## JURY DEMAND

Plaintiff Regina Tasca hereby demands a trial by jury as to all causes so triable.

**The Nirenberg Law Firm, LLC**

Dated: May 4, 2012                    By:    s/ Jonathan I. Nirenberg
                                                     Jonathan I. Nirenberg

# CIVIL COVER SHEET

The JS 44 civil coversheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Regina Tasca | Borough of Bogota, John C. Burke, James L. Sepp, Robert Piterski, and Jerome Fowler |

| (b) County of Residence of First Listed Plaintiff | Bergen County | County of Residence of First Listed Defendant | Bergen County |
|---|---|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | | *(IN U.S. PLAINTIFF CASES ONLY)* | |
| | | NOTE: | IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

**(c)** Attorneys *(Firm Name, Address, Telephone Number, and Email Address)*
Jonathan I. Nirenberg

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☒ 441 Voting | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition) | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983

Brief description of cause:
Gender and sexual orientation discrimination/harassment, and retaliation

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23
- DEMAND $
- CHECK YES only if demanded in complaint:
- JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

| JUDGE | | DOCKET NUMBER | |

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 05/04/2012 | s/ Jonathan I. Nirenberg |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

**THE NIRENBERG LAW FIRM, LLC**
One University Plaza, Suite 607
Hackensack, NJ 07601
Tel: (201) 487-2700
Fax: (201) 487-2701
jnirenberg@njemploymentlawfirm.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| REGINA TASCA, | CIVIL ACTION NO. |
| Plaintiff, | |
| v. | CERTIFICATION OF SERVICE |
| BOROUGH OF BOGOTA, POLICE CHIEF JOHN C. BURKE, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, POLICE CAPTAIN JAMES L. SEPP, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, POLICE SERGEANT ROBERT PITERSKI, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, AND PATROLMAN JEROME FOWLER, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, | |
| Defendants. | |

I, Jonathan I. Nirenberg, of full age, hereby certify and say:

I am a member of The Nirenberg Law Firm, LLC, attorneys for the plaintiff in the above-captioned action. On May 4, 2012, I caused to be filed with the Clerk, United States District Court for the District of New Jersey, via ECF, (1) the Complaint & Jury Demand; (2) a Civil Cover Sheet; and (3) this Certification of Service.

I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: May 4, 2012                              By:   s/ Jonathan I. Nirenberg
                                                      Jonathan I. Nirenberg